UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| RICHARD M. SCOTT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. V-06-79 |
| v. | § | |
| | § | |
| BP AMOCO CHEMICAL COMPANY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION & ORDER

This action arises under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, and the Texas Commission on Human Rights Act ("TCHRA"), TEX. LAB. CODE ANN. § 21.05.  Pending before the Court is Defendant's Motion for Summary Judgment (Dkt. No. 24). Having considered the motion, the responses thereto, the entire record and the applicable law, the Court is of the opinion the motion should be granted in part and denied in part.

### Background

Plaintiff Richard M. Scott ("Scott") is a former employee of Defendant BP Amoco Chemical Company's ("BP Amoco") Green Lake Chemical plant (the "Plant"), where he served as a plant operator for more than five years.[1]  Scott filed his complaint against BP Amoco in July 2006, claiming he was subject to workplace harassment based on, and ultimately fired because of, his speech impediment in violation of the ADA and TCHRA.

Scott has dealt with a speech impediment since he was a child.[2]  According to Scott, based on a brain disorder, his speech is "halting and uneven," "broken by stops and starts and breaks" and makes

---

[1] Dkt. No. 28 at p. 1.

[2] Dkt. No. 24, Ex. A at pp. 201-02.

it "virtually impossible for [him] to get [his] thoughts out like those who don't have [his] impairment can."[3]  Scott's speech also apparently deteriorates when "under great stress."[4]  Despite Scott's speech impediment, Scott received a college degree and has worked a variety of jobs, including as a salesman and sales service manager.[5]  Scott currently works as a process operator at a Formosa Plastics plant.[6]  Consistent with his employment history, Scott has asserted that his speech impediment does not substantially limit his ability to work or interfere with his job performance.[7]  Scott has also testified that he does not "lock up" when speaking.[8]

Although Scott claimed (a) he received speech therapy in elementary school and at some time during his teenage years and (b) he received a college scholarship based on his speech impediment from the Texas Rehabilitation Commission,[9] he has failed to provide any medical records or other documentation bearing indication of his speech impairment.  However, even if the Court were to accept as true Scott's deposition testimony that he received therapy earlier in life, it would appear that he has

---

[3] Dkt. No. 28, Ex. 1 at p. 1.  BP Amoco objects to various statements contained in Dkt. No. 28, Ex. 1 ("Declaration of Richard Scott") on the grounds they are conclusory, lack personal knowledge and lack foundation.  *See* Dkt. No. 30 at p.2. Although portions of Scott's Declaration might be objectionable, the statements considered for the purposes of this Order are not. Because Scott has dealt with his speech impediment since childhood, he has sufficient personal knowledge and foundation concerning his condition and how it effects his ability to communicate. Moreover, the Court finds the statements quoted in this Order are not of such conclusory nature that they should not be considered. To the extent the Court has considered statements from Dkt. No. 28, Ex. 1, BP Amoco's objections are overruled.

[4] the objections raised to statements contained therein used for this Order are overruled *Id.*

[5] Dkt. No. 24, Ex. 1.

[6] *Id.* Scott has been employed at Formosa Plastics since August 2005.

[7] Dkt. No. 24, Ex. F at Answer to Request for Admission No. 3; Dkt. No. 24, Ex. A at p. 194; Dkt. No. 1 at p. 2.

[8] Dkt. No. 24, Ex. A at p.199.

[9] Dkt. No. 24, Ex. A at pp. 201-02.

not undergone speech therapy in over twenty years.[10]  Similarly, if the Court were to accept as true Scott's assertion he received a scholarship from the Texas Rehabilitation Commission, it appears the last time he received such scholarship was over two decades ago.[11]

The record fails to reveal whether Scott was ever informed by a physician of any restrictions or limitations due to his speech.  Scott has brought forth no evidence indicating he must use a modified telephone or otherwise requires home or work accommodations based on his speech impediment.  Scott testified at his deposition for over eight hours and had no difficulty speaking with reasonable clarity for the duration of the proceeding, which he claims to have participated in after working a night shift.[12]  The Court has reviewed Scott's videotaped deposition testimony and finds that Scott intelligibly communicated through speech in response to hours of questioning.

BP Amoco hired Scott as a plant operator on February 1, 1999.[13]  The record bears no indication Scott reported his speech impediment to BP Amoco as a disability when he applied for or began his employment or at any time thereafter.[14]  Similarly, it does not appear Scott ever requested an accommodation from BP Amoco regarding his speech impediment.  However, the parties do not dispute that, at the time Scott was hired, his speech was at least to some extent impaired.

Scott maintains his speech impediment was discussed by the BP Amoco hiring committee before

---

[10] Scott was born on April 6, 1964 and was 42 years old at the time he filed this action. Dkt. No. 28, Ex. 1 at p. 1.

[11] Scott's purported scholarship covered rent during his time in college, 1987-90. Dkt. No. 24, Ex. A at pp. 201-02.

[12] *Id.* at pp. 6, 194, 205; Dkt. No. 24, Ex. G.

[13] Dkt. No. 24, Ex. A at pp. 8, 14, 23-25.

[14] Dkt. No. 24, Ex. E ¶6.

3

he was offered employment.[15]   However, Scott also asserts that the committee ultimately decided his speech was "not a major factor" and offered Scott a position as a plant operator.[16]

After Scott was hired, he began to receive training in a variety of operations and procedures related to the Plant's function and his role as a plant operator.[17]   At the time Scott was discharged, he had received over 1,300 hours of training.[18]   Scott's initial supervisor was Dale Jones ("Jones").   After training between February and June 1999, Jones certified Scott to work in the Aceto Purification Unit ("APU").[19]   Following training between September and December 1999, Jones certified Scott to work in the Recovery and Purification Unit ("RPU").[20]

Although it is unclear when, at some point after Scott was certified to work in the RPU, he began requesting that Jones train him to operate the RPU and APU Boards in the control room ("Control Board").   Jones had concerns regarding Scott's training on the Control Board.   Jones feared that due to Scott's speech impediment, he might hesitate or "lock up" in high stress situations and be unable to communicate adequately in the event the Plant needed to be evacuated.[21]   Jones testified that the "[C]ontrol [B]oard had the assignment of making [] [emergency] notifications to the incident command

---

[15] Dkt. No. 24, Ex. F at Answer to Interrogatory No. 5.  A review of Scott's EEOC file indicates that he bases this allegation on second-hand statements from Ed Sanchez and Roy Shepherd, other Plant employees.  No affidavit or declaration from Mr. Shepherd is on file with the Court. While a declaration from Mr. Sanchez is attached to Scott's Response to Defendant's Motion for Summary Judgment, *see* Dkt. No. 28, Ex. 5, the declaration does not discuss the events surrounding Scott's hiring.

[16] *Id.*

[17] Dkt. No. 24, Ex. 3; Dkt. No. 24, Ex. A at pp. 25-26.

[18] Dkt. No. 24, Ex. 11.

[19] Dkt. No. 24, Ex. 4; Dkt. No. 24, Ex. 5; Dkt. No. 24, Ex. A at pp. 30-31, 35-38.

[20] Dkt. No. 24, Ex. 6; Dkt. No. 24, Ex. A at pp.38-40.

[21] Dkt. No. 24, Ex. B at pp. 140-41; Dkt. No. 28, Ex. 4 at pp. 84-90.

system, to the public address system for evacuating the plant announcing when, direction and things of that nature."[22]  Jones based his apprehension on his observation that "face to face with [Scott] if he was asked a direct question a lot of times when you made eye contact with him it caused him to really hesitate in what he was trying to say."[23]  Jones shared his concerns with BP Amoco's Human Resources Department.[24]

Jones also expressed his reservations during Plant supervisor meetings.  Ed Sanchez ("Sanchez"), a supervisor who attended these meetings, declared that Jones described Scott as "slow" and "too slow to be successful" and complained about Scott's persisting in his wanting to be trained to operate the Control Board.[25]  Sanchez further testified that Jones was worried Scott might "lock up" in pressure situations.[26]  Sanchez believed Jones had an "obvious bias" against Scott and testified that in response to an alleged safety incident involving Scott, Jones claimed Scott would never be a good operator.[27]  Sanchez stated that, in his opinion, Jones was "constantly looking for ways to cut [Scott]

---

[22] Dkt. No. 24, Ex. B at pp. 140-41

[23] *Id.*

[24] *Id.*; Dkt. No. 28, Ex. 4 at pp. 85-86.

[25] Dkt. No. 28, Ex. 5. BP Amoco objects to various statements contained in Dkt. No. 28, Ex. 5 ("Declaration of Ed Sanchez") on the grounds they are mere subjective belief, conclusory, speculative, irrelevant, lack foundation and lack personal knowledge.  *See* Dkt. No. 30 at pp.6-7. As with Scott's Declaration above, although portions of Sanchez's Declaration might be objectionable, the statements considered for the purposes of this Order are not. Because Sanchez was a Plant supervisor, it is reasonable to infer that he had personal knowledge and a sufficient foundation for testifying to BP Amoco's practices and procedures and the standards to which its employees were held.  The fact that he was Scott's supervisor at the time of his firing further establishes that he possessed sufficient knowledge of the circumstances surrounding Scott's termination and the standards to which Scott was held.  Furthermore, the Court finds the statements quoted in this Order are not of such conclusory, speculative or purely subjective nature that they should be excluded from consideration.  To the extent the Court has taken into account statements from Dkt. No. 28, Ex. 5, BP Amoco's objections are overruled.

[26] *Id.*

[27] *Id.*

5

down."[28]

Despite Jones' hesitancy to allow Scott to train on the Control Board, Scott eventually began his Control Board training.[29]  Around the time Scott began to train on the Control Board, Robert Weaver ("Weaver") replaced Jones as Scott's supervisor.[30]  Weaver certified Scott to work the Control Board in August 2003.[31]  During all relevant times, Lance Ross ("Ross") served as Manufacturing Manager at the Plant, a position that placed him above both Weaver and Jones.  Ross attended the supervisor meetings discussed above and was aware of Jones' apprehension surrounding Scott's Control Board training.

Scott also claims that during his employment, Plant employees James Franklin ("Franklin") and Coronado Chapa ("Chapa") "regularly got in Scott's face and mock[ed] his stuttering with facial gestures and loud noises or observe[d] this conduct while laughing."[32]  Scott contends that Jones and Weaver laughed along-side Franklin and Chapa, did nothing to curb their taunts and participated in these actions themselves.[33]  Scott testified that Franklin and Chapa's taunts occurred before or, at the latest,

---

[28] *Id.*

[29] Dkt. No. 24, Ex. 9; Dkt. No. 24, Ex. A at pp. 47-49.  Scott trained to operate the Control Board between November 2002 and April 2003.  Scott testified that Jones was his supervisor at the time he began training on the Control Board.  Dkt. No. 24, Ex. A at pp. 47-49.  Jones, however, testified that he did not train Scott on the Control Board.  Dkt. No. 28, Ex. 4 at pp. 84-85.

[30] Dkt. No. 24, Ex. 9; Dkt. No. 24, Ex. A at pp. 47-49. Although not entirely clear, it appears that Weaver replaced Jones as Scott's supervisor simply because the two supervisors swapped shifts. Dkt. No. 24, Ex. A at pp. 47-49. Scott neither alleges, nor can the Court otherwise identify any evidence supporting an inference that, the supervisor switch occurred because some problem Jones' may have had with Scott.

[31] *Id.*

[32] Dkt. No. 28 at p. 3; Dkt. No. 24, Ex. A at pp. 174, 186; Dkt. No. 28, Ex. 4 at pp. 92-94.

[33] *Id.*

during April 2003.[34]  Scott further maintains that Plant employees humiliated Scott by ensuring the

company bus to the offsite parking lot left right as Scott walked up, teased him because of his weight

and mocked the size of his genitals while he was taking a safety shower following a chemical exposure

incident.[35]

During his tenure as a plant operator, Scott was purportedly involved in a series of safety-related

incidents.  The first such incident occurred in November 2001.[36]  Jones discussed the incident with Scott

and prepared a letter documenting the discussion.[37]  Nothing in the letter refers to or otherwise indicates

Jones' discussion with Scott involved Scott's speech impediment.  Similarly, Scott's 2001 Employee

Development Review did not refer to his speech impediment.[38]

The next three incidents involving Scott occurred in 2003.[39]  Weaver, who had taken over for

Jones as Scott's supervisor, discussed the incidents with Scott and issued a November 2003 Formal

---

[34] Franklin was transferred from BP Amoco's Green Lake Plant to its Texas City Plant in late 2002 and his taunts could thus not have carried into 2003.  Moreover, Scott admitted Chapa's taunts surrounded his Control Board training, which ended in April 2003.  Dkt. No. 24, Ex. A at pp. 187-190.  Therefore, the latest period in which either Franklin or Chapa taunted Scott would be April 2003.

[35] Dkt. No. 24, Ex. A at pp. 193, 87-88, 191-193.

[36] Dkt. No. 24, Ex. 20; Dkt. No. 24, Ex. A at pp. 79-80.  The incident involved Scott's allegedly deficient removal of a pressure gauge from a pump with the isolation block valve still in the open position, which resulted in Scott and two maintenance workers being sprayed with a small amount of organic process liquid.

[37] Dkt. No. 24, Ex. 20; Dkt. No. 24, Ex. A at p. 83.

[38] Dkt. No. 24, Ex. 21.

[39] Dkt. No. 24, Ex. 23; Dkt. No. 24, Ex. A. at pp. 103-12.  These 2003 incidents involved Scott allegedly (1) leaving a Y-strainer valve open leading to a small overflow of water contaminated with traces of material from the Plant's processes; (2) opening the wrong valve resulting in off spec product being produced for over two days; and (3) failing to properly align a pump being placed in service giving rise to a situation in which the process stream "deadheaded" at the misaligned pump.  Scott claims that portions of these events did not occur as BP Amoco reported.  Sanchez buttresses Scott's claims and he testified that Scott was not in violation of any BP Amoco policy concerning the misaligned pump incident.  However, as indicated further below, for the purposes of this Order, determining whether and how these events in fact occurred is not crucial to the Court's ruling.

Written Warning concerning the 2003 incidents.[40]  The warning observed a "serious pattern of deficient performance" and detailed how Weaver believed the incidents occurred because of Scott's "inattention to detail."[41]  Nothing in the warning refers to Scott's speech or otherwise indicates Weaver considered Scott's speech impediment in assessing his performance.  Like his 2001 performance review, Scott's 2003 Employee Development Review did not discuss his speech impediment.[42]  In fact, Scott's 2003 Employee Development Review, penned by Weaver, stated the following: "I feel [Scott] has the inate [sic] ability to possess a much higher level of performance than he exhibited in 2003. [Scott] should focus on self motivation in managing his time more effectively to acquire the expected knowledge and skill level of a 5 year experienced, grade 1, technician."[43]

Shortly thereafter, in March 2004, Scott was involved in another incident which appears to be the most potentially harmful of the series.[44]  As a result of this incident and its allegedly high potential for serious injury or plant damage, a full investigative committee convened and determined that Scott failed to follow basic operating and safety procedures.[45]  Jones was the lead investigator of the five-person investigative committee.[46]  Following the investigative committee's determination, Scott was

---

[40]  Dkt. No. 24, Ex. 23; Dkt. No. 24, Ex. A. at pp. 103-12.

[41] Dkt. No. 24, Ex. 23.

[42] Dkt. No. 24, Ex. 29.

[43] *Id.*

[44] Dkt. No. 24, Ex. 24; Dkt. No. 24, Ex. A at pp. 118, 144-45; *see also* Dkt. No. 24 at 12. This incident involved Scott's alleged failure to follow the lockout/tag-out ("LOTO") and master clearance card ("MCC") procedures.  These violations could have purportedly resulted in a situation in which energy flowed to equipment it should not have, leading to a wide variety of potential problems if the active flow of power was not known to other employees at the Plant.  Scott admits that he made mistakes in implementing the LOTO and MCC procedures. Dkt. No. 24, Ex. A at pp. 133-137.

[45] Dkt. No. 24, Ex. 54; Dkt. No. 24, Ex. A at pp. 118-45; Dkt. No. 24, Ex. B at p. 18.

[46] Dkt. No. 24, Ex. B at pp. 18, 47-48.

issued a three-day suspension.[47]  Nothing surrounding the investigative committee's determination or suspension notice referenced or otherwise indicated that Scott's speech impediment was at issue or was a factor in BP Amoco's actions.

Finally, in July 2004, Scott was involved in the incident that prompted his termination.[48]  Like the March 2004 incident, BP Amoco conducted a full committee investigation.[49]  Neither Jones nor Weaver were among the five members of this investigative committee.[50]  As a result of this investigation, Ross and Libby Andrews-Simmons ("Andrews-Simmons"), the Human Resources manager at the Plant, recommended that Plant Manager John Harvey III ("Harvey") terminate Scott's employment.[51]  Harvey testified that, in connection with this decision, he, Ross and Andrews-Simmons never discussed Scott's speech impediment.[52]  However, when making this determination, Ross conferred with Jones to get his "feelings" as to Scott's discharge despite the fact Jones played no role in the investigation surrounding Scott's alleged misconduct.[53]

In a letter dated August 23, 2004, BP Amoco terminated Scott's employment.[54]

---

[47] Dkt. No. 24, Ex. 24.

[48] Dkt. No. 24, Ex. 30; Dkt. No. 24, Ex. A at pp. 145-46.  This incident involved Scott's alleged failure to report a problem to the correct supervisor following his observation that other employees had transferred dispersant in to the wrong tote.  Scott contends his actions surrounding this incident do not amount to error on his part, and if anything, establish that he went above and beyond his duties as an employee by reporting the error of others whom he was not observing in a supervisory role.

[49] Dkt. No. 24, Ex. 30; Dkt. No. 24, Ex. C at p. 28.

[50] Dkt. No. 24, Ex. 30.  The five members of the investigative team were Lisa Cox, Daren Jarisch, Celia Clevenger, Don Pennington and Mark Tieken. *Id.* While Jones did not serve on the investigative committee, he was directed by the committee to implement several of its "suggested corrective actions." *Id.*

[51] Dkt. No. 24, Ex. D at p. 135; Dkt. No. 24, Ex. C at pp. 52, 117; Dkt. No. 24, Ex. E.

[52] *Id.*

[53] Dkt. No. 28, Ex. 5.

[54] Dkt. No. 24, Ex. 32.

The termination letter was signed by Sanchez and copied to Harvey, Ross and Andrews-Simmons.[55]  Sanchez later asserted that Ross forced him to write and sign the letter under threat of his own discharge.[56]  At the time Scott's termination was being considered, Sanchez attempted to persuade Ross either not to punish Scott or to sanction him less severely.[57]  Sanchez testified that Scott was being held to a different standard than other employees at the Plant and Ross was pursuing what Sanchez characterized as his "absolute vendetta" against Scott.[58]  According to Sanchez, Scott did not violate any BP Amoco policy concerning this final incident.[59]  Sanchez maintains that, in response to his defending Scott, Ross charged Sanchez with "making excuses" for Scott's deficient performance.[60]  Sanchez also asserts that, during this discussion, Ross called Scott "slow."[61]  After Sanchez acquiesced to Ross' demands and signed the termination letter, Ross gave Sanchez a downgraded evaluation based on his hesitancy to discharge Scott.[62]

Although Scott concedes he made mistakes during his employment, including some in connection with the incidents mentioned above, he contends that the final incident—which ultimately led to his termination—was merely a pretext for BP Amoco's unlawful discrimination or that his impairment was a motivating factor in the company's termination decision.

---

[55] *Id.*

[56] Dkt. No. 28, Ex. 5.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] Dkt. No. 28, Ex. 5.

## Standard of Review

A summary judgment shall be issued if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Hall v. Thomas*, 190 F.3d 693, 695 (5th Cir. 1999). In considering a motion for summary judgment, the court construes factual controversies in the light most favorable to the non-movant, but only if both parties have introduced evidence showing that an actual controversy exists. *Lynch Props., Inc. v. Potomac Ins. Co. of Illinois*, 140 F.3d 622, 625 (5th Cir. 1998). The burden is on the movant to convince the court that no genuine issue of material fact exists as to the claims asserted by the non-movant, but the movant is not required to negate elements of the non-movant's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The non-moving party may not rest solely on its pleadings. *King v. Chide*, 974 F.2d 653, 656 (5th Cir. 1992). For issues on which the non-movant will bear the burden of proof at trial, that party must produce summary judgment evidence and designate specific facts which indicate that there is a genuine issue for trial. *Celotex*, 477 U.S. at 322-23; *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To meet its burden, the non-moving party must present "significant probative" evidence indicating that there is a triable issue of fact. *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994). If the evidence rebutting the summary judgment motion is only colorable or not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51. (1986).

**Discussion**

**I. Claims of Harassment and Discrimination Pertaining to BP Amoco's Delay in Training Scott**

The ADA requires a plaintiff to file a charge of discrimination with the Equal Employment

Opportunity Commission ("EEOC") within 300 days of the alleged discriminatory act.   42 U.S.C. §

12117 (incorporating 42 U.S.C. § 2000e-5(e)); *see also Ramirez v. City of San Antonio*, 312 F.3d 178,

181 (5th Cir. 2002).  The TCHRA requires a plaintiff to file a discrimination claim with the EEOC or

the Texas Commission on Human Rights ("TCHR") within a shorter 180-day period of limitations.

TEX. LAB. CODE § 21.202; *see also Estate of Martineau v. ARCO Chem. Co.*, 203 F.3d 904, 913-14 (5th

Cir. 2000).  The limitations period begins to run "from the time the complainant knows or reasonably

should have known that the challenged act has occurred."  *Ramirez*, 312 F.3d at 181.

Scott filed his charge with the EEOC on December 11, 2004.[63]  BP Amoco thus argues that most

of the events about which Scott complains are time-barred because Scott presents no evidence he was

subjected to harassment or a delayed training on the Control Board in the 300-day period before he filed

his EEOC charge; to wit, between February 16, 2004 and December 11, 2004.[64]  A review of the facts

discussed above confirms BP Amoco's contentions.  Scott responds by asserting that claims involving

workplace harassment or a delay in Control Board training are not at issue here.[65]  Scott narrows the

claims asserted solely to those surrounding his termination.[66]  Although Scott maintains his harassment

---

[63] Dkt. No. 28, Ex. 10.

[64] Dkt. No. 24 at pp. 19-24.

[65] Dkt. No. 28 at pp. 1 ("This case was brought to challenge the dismissal of a good worker because of a disability."); 1 n.1 ("Defendant claims that [P]laintiff is also pursuing a claim of harassment and failure to train, but these are not—and never have been—claims in this case. Scott sued to challenge his job loss."); 13 ("After spending five pages knocking down legal claims that are not even involved in this case, [BP Amoco] turns to the real issue—whether there is a genuine issue of material fact about whether disability played any role in [BP Amoco's] decision to discharge him.").

[66] *Id.*

12

and delay in training claims are "not even involved in this case," such a point is not clear from his Original Complaint.[67]  Thus, for the sake of completeness, BP Amoco's motion for summary judgment on Scott's potential harassment and delay in training claims is granted.

Scott's remaining claim of disability-based discrimination concerning his discharge is not time-barred because the adverse employment action did not occur until August 23, 2004, when Scott was fired.

**II. Claims of Discrimination Pertaining to Scott's Termination**

**1. Law Applicable to Scott's ADA and TCHRA Claims[68]**

Under the familiar *McDonnell Douglas* framework, Scott must first establish a prima facie case of discrimination by showing: (1) he suffers from a disability as defined by statute; (2) he was qualified for his job; (3) he experienced an adverse employment action on account of his disability; and (4) BP Amoco replaced him with or treated him less favorably than a non-disabled employee.  *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003); *Allen v. Rapides Parish School Bd.*, 204 F.3d 619, 623 n.3 (5th Cir. 2000); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Once Scott establishes his prima facie case, the burden shifts to BP Amoco to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Id.* Once BP Amoco articulates such a reason, the burden shifts back to Scott to show by a preponderance of the evidence that the reason was (1) merely a pretext for unlawful discrimination or (2) only one of the reasons for

---

[67] *See* Dkt. No. 1 at pp. 2-3 ("Defendant began to *harass* Plaintiff"; "Defendant *discriminated against* [Plaintiff] because of his disability"; "Plaintiff would *further* show that Defendant fired Plaintiff [based on his alleged disability]"; "Defendant, *by acting on the basis of a disability*, has violated the TCHRA and ADA.") (emphasis added).

[68] Aside from the divergent statute of limitations mentioned above, the TCHRA parallels the ADA.  Texas courts accordingly rely on analogous federal precedent when interpreting the TCHRA. *See Rodriguez v. Conagra Grocery Prods. Co.*, 436 F.3d 468, 473-74 (5th Cir. 2006); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285-86 (5th Cir. 2004). Therefore, Scott's TCHRA and ADA claims will be treated as coextensive and the Court will focus on federal precedents in evaluating both.

its actions and that another motivating factor was the plaintiff's protected characteristic.  *Id.*; *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

Under the ADA, it is unlawful for an employer to discriminate against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures[;] the hiring, advancement, or discharge of employees[;] employee compensation[;] job training[;] and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a).  A plaintiff is "disabled" under the ADA if he: (1) has a physical or mental impairment that substantially limits one or more of his major life activities; (2) has a record of such an impairment; or (3) is regarded by his employer as having such an impairment. 42 U.S.C. § 12102(2).

An individual is "substantially limited" if he or she is:

(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j).

"Major life activities" includes functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

In determining whether a claimant's impairment substantially limits a major life activity, courts should consider the following factors: "(i) The nature and severity of the impairment, (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

**2. Scott's Primae Facie Case of Discrimination**

BP Amoco contends that Scott fails to establish a prima facie case of discrimination because he

can not establish that he (1) has a disability as defined by statute, (2) was subject to an adverse employment action based on such disability[69] or (3) was replaced by or treated less favorably than a similarly situated, non-disabled employee.

### a. Scott's Suffering from a "Disability" Within the Meaning of the ADA

Scott maintains that he has an actual disability—an impairment substantially limiting one or more of his major life activities—and that BP Amoco regarded him as having such a disability.[70]  BP Amoco argues Scott has failed to raise a genuine issue of material fact as to whether he is disabled as defined by the ADA or that BP Amoco regarded him as such.

### i. Scott's Status as "Disabled" as Defined by Statute

Although BP Amoco concedes Scott suffers from a physical impairment (his speech impediment) that affects a major life activity (speaking), merely being subject to such an impairment is insufficient to render one disabled as defined by the ADA.  *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 195 (2002) ("[M]erely having an impairment [that affects a major life activity] does not make one disabled for purposes of the ADA.").  To be disabled within the meaning of the ADA, Scott must demonstrate his impairment "substantially limits" one or more major life activities.  *Id.*; 42 U.S.C. § 12102(2); *see also Ivy v. Jones*, 192 F.3d 514, 516 (5th Cir. 1999) ("The particularized inquiry mandated by the ADA centers on *substantial limitation of major life activities, not mere impairment*.") (emphasis added).  Where, as here, the existence of an impairment affecting a major life activity is not at issue, the

---

[69] This element of Scott's prima facie case is addressed below in the section concerning BP Amoco's allegedly legitimate non-discriminatory reasons for Scott's discharge, because, if true, would establish that Scott was not subject to an adverse employment action on account of his impairment.  Conversely, if Scott can establish that BP Amoco's proffered non-discriminatory reason is false and merely pretextual or that his speech impediment was a motivating factor in BP Amoco's termination decision, he would have established both the third element of his  prima facie case and the third prong of the *McDonnell Douglas* test.

[70] Scott does not appear to contend there is a record of his impairment as substantially limiting one or more of his major life activities.  However, if he were to do so, his contention would clearly fail as no such record exists.

substantial limitation requirement becomes the lynchpin of the disability inquiry.  *Ivy*, 192 F.3d at 516.

As the Supreme Court has observed, the terms provided by the ADA, including the term "substantially limiting," must be "interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota Motor*, 534 U.S. at 197.  Accordingly, courts must "conduct a rigorous and carefully individualized inquiry into [a plaintiff's] claimed disability to fulfill [the court's] statutory obligation to determine the existence of disabilities on a case-by-case basis.'" *Waldrip v. General Elec. Co.*, 325 F.3d 654, 654-55 (5th Cir. 2003) (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999)); *see also McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 281 (5th Cir. 2000) ("[D]isability determinations must be made on a case-by-case basis, without strict categorical reliance on disability determinations made in prior cases as establishing *per se* disability or non-disability.").

Here, the record clearly reveals Scott's speech impediment does not substantially limit one of his major life activities, including speaking.  Although it is undisputed that Scott's speech pattern is interrupted due to his impairment, this has not prevented him from attending, and doing well in, college.  Nor has Scott's speech impediment halted him from working a variety of jobs before and after his time with BP Amoco, including several in the area of sales.  Scott has testified his speech has not prevented him from gaining employment and also stated that he does not "lock up" when speaking.

Scott has presented no medical records or other documentary evidence indicating he is substantially limited by his speech.  Based on Scott's own testimony, he has not undergone speech therapy in over twenty years and nothing indicates Scott plans on enrolling in a therapy program in the future.  Similarly, Scott's claim he once received a college scholarship based on speech is rooted in a scholarship purportedly awarded decades ago.

The record is entirely bare of evidence revealing that a medical professional has determined

Scott's speech is substantially limiting, that Scott makes use of a modified telephone or that Scott otherwise requires accommodations because of his speech.  Scott, moreover, failed to report his speech impediment as a disability to BP Amoco before, or at anytime after, he was hired as a plant operator.  Perhaps most significantly, Scott spoke intelligibly for over eight hours during his deposition, which by Scott's own admission, took place the day after he had worked a night shift.  Scott's evidence that his speech impediment is substantially limiting consists merely of deposition testimony and declarations that he indeed has trouble speaking at times.  However, as stated above, his speech impediment is not in dispute, and the mere existence of such an impairment does not fall within the ADA's definition of a disability.  *Ivy*, 192 F.3d at 516.

In light of the record before the Court, Scott fails to raise a genuine issue of material fact as to whether his speech impediment substantially limits a major life activity.  Although the record speaks for itself in establishing that Scott does not have a disability as defined by the ADA, the Court notes that other courts considering whether a claimant has a disability based on speech have come to the same conclusion when confronted with similar facts.  *See Dorn v. Potter*, 191 F. Supp. 2d 612 (W.D. Penn. 2002) (finding an employee's speech was a not a disability under the ADA because it did not affect his ability to obtain or perform jobs, impede his speaking intelligibly during deposition, require the use of a modified telephone or necessitate his participation in speech therapy within fifteen years prior to the commencement of his action); *Reeder v. Frank*, 813 F. Supp. 773 (D. Utah 1992) (holding no disability existed based on the plaintiff's seven hours of intelligible deposition testimony along with his failure to declare his speech impediment as a disability and failure to provide medical records of his impairment); *but see Andresen v. Fuddruckers, Inc.*, No. Civ. 03-03292 DWF/SRN, 2004 WL 2931346, at *1 (D. Minn. Dec. 14, 2004) (finding a fact issue as to whether an employee had a disability because

17

there was specific evidence the speech impediment caused the plaintiff significant problems and a speech pathologist testified her impediment was severe and substantially limiting to her oral communications); *Brotchner v. Fed. Express Corp.*, No. 04-4119 Ma/P, 2006 WL 1049344 (W.D. Tenn. Apr. 19, 2006) (finding a fact issue regarding the determination of a complainant's disability based on the unspecified contents of the employee's deposition testimony and medical records).  Accordingly, Scott's speech impediment is not a disability under the ADA.

### ii. BP Amoco's  Regarding Scott as Being "Disabled"

A person is "regarded as" disabled—having an impairment that substantially limits a major life activity—if he (1) has an impairment that is not substantially limiting but which his employer perceives as being substantially limiting; (2) has an impairment that is substantially limiting only because of the attitudes of others toward such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment.  *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 281 (5th Cir. 2000); *Bridges v. City of Bossier*, 92 F. 3d 329, 332 (5th Cir. 1996); *see also* 29 C.F.R. § 1630.2(l).  To establish that BP Amoco regarded him as disabled, Scott must establish that the impairment, if it existed as perceived, would be substantially limiting.  *McInnis*, 207 F.3d at 281; *Garret v. Autozone, Inc.*, 224 F.3d 765 (Table) (5th Cir. 2000) (unpublished) ("the key to a 'regarded as' claim is that the employee is viewed as having a 'substantially limiting impairment,' which means that the person is perceived as being either unable to perform or significantly restricted in the performance of a 'major life activity'").  As analyzed above, Scott has a speech impediment which is not substantially limiting as defined by the ADA.  The question is thus whether BP Amoco perceived Scott's impairment as substantially limiting one of his major life activities.  Although Scott has not clearly alleged which major life activity or activities BP Amoco regarded his speech as limiting, it appears he asserts his

claims based on some amalgam of the major life activities of working, speaking and/or thinking.[71]

To the extent Scott can be understood as arguing BP Amoco perceived him as substantially limited in the major life activity of working, his contention clearly fails.  As numerous courts have observed, "an inability to perform one particular job, as opposed to a broad range of jobs, does not constitute an impairment that substantially limits one's ability to work." *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 508 (5th Cir. 2003) (citing 29 C.F.R. § 1630.2(j)(3)(i)); *see also Windly v. Hightower Oil Co., Inc.*, 91 Fed. App'x. 330, 332-33 (5th Cir. 2004) (unpublished); *McClure v. Gen. Motors Corp.*, 75 Fed. App'x. 983, 984 (5th Cir. 2003) (unpublished); *Deas v. River West, L.P.*, 152 F.3d 471, 480-82 (5th Cir. 1998).  Because Scott has presented no evidence that BP Amoco regarded him as limited in his ability perform a broad range of jobs, the Court finds Scott failed to raise a fact issue as to whether BP Amoco perceived him as substantially limited in the major life activity of working.

However, insofar as Scott maintains BP Amoco considered him substantially limited regarding the major life activities of speaking or thinking, the issue is less clear.  Scott's employment history at BP Amoco significantly belies his claim the company perceived him as disabled regarding his ability to speak or think.  The record reveals that during his tenure with BP Amoco, Scott advanced through the company, earned pay increases as he advanced and received over 1,300 hours of training.  BP Amoco never once accommodated or attempted to accommodate Scott as a disabled employee.  When reviewing BP Amoco's evaluations of Scott—both his yearly Employee Development Reviews and the

---

[71] *See* Dkt. No. 30 at pp. 14-18. The Court notes that thinking is not one of the enumerated major life activities set forth by 29 C.F.R. § 1630.2(i).  Moreover, no binding authority has held that thinking qualifies as such. However, the Court recognizes that some Circuits have held thinking to be a major life activity.  *See Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1061 (9th Cir. 2005); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 307 (3d Cir. 1999); *but see Hill v. Metro. Gov't of Nashville*, 54 Fed. App'x. 199, 201 (6th Cir. 2002) (unpublished). Because neither party has briefed the issue and such a determination is not crucial to the disposition of this order, the Court will assume for the purposes of this order that thinking is a major life activity.

evaluations relating to incidents he was purportedly involved in—the Court finds no reference or indication that his speech was considered, much less considered substantially limiting to his ability to speak or think.  In one such evaluation, Weaver even noted that despite Scott's "innate ability" to do better, his lack of attention to detail was hindering his performance as a plant operator.  These statements and actions certainly do not seem to be those of a company who regarded an employee as substantially impaired.  To the contrary, they seem to indicate that BP Amoco regarded Scott as not disabled at all. Scott's own claim that the BP Amoco hiring committee discussed his speech impediment when they hired him, but decided it was not a "major factor," further undercuts his contentions.

Conversely, Jones' fears and comments as depicted by Sanchez indicate that he had serious reservations concerning Scott's ability to speak or think.  Sanchez's testimony that  Jones repeatedly complained about Scott's requests to be trained on the Control Board, feared that he may "lock up" on the job, constantly referred to him as "slow" or "too slow to be successful" and generally had, in Sanchez's opinion, an "obvious bias" against him bolsters Scott's argument and gives the Court pause in concluding that no fact issue exists as to whether Scott was regarded as substantially impaired.  If Scott were "slow," "too slow to be successful" or did "lock up" in pressure situations, i.e., if Scott's impairment existed as BP Amoco perceived it, a fact issue might exist as to whether his perceived impairment substantially limited one of his major life activities. Sanchez's testimony concerning Ross' behavior surrounding Scott's termination further slows the Court from dismissing Scott's claims at this stage.

The fact Scott's training on the Control Board was delayed based on Jones' apprehension gives additional credence to Scott's argument that BP Amoco considered Scott disabled.  Although it is beyond dispute that despite the delay, Scott was eventually trained to operate the Control Board, the

delay in training gives rise to some inference, albeit slight, that BP Amoco considered Scott substantially limited in his abilities.  Jones and Ross' comments, behavior and Scott's delay in training, when viewed in the light most favorable to the plaintiff and taken with all reasonable inferences therefrom, could allow a jury to find that BP Amoco regarded Scott as substantially impaired.  Based on the evidence presented at summary judgment, the Court concludes that Scott has, by an admittedly narrow margin, raised a genuine issue of material fact as to whether BP Amoco regarded him as substantially limited in speaking and/or thinking.

### 2.   BP Amoco's Replacing Scott With or Treating Him Less Favorably Than a Non-Disabled Employee

As BP Amoco does not claim Scott was not qualified for his job, the Court next addresses the fourth element of Scott's prima facie case, whether BP Amoco replaced him with or treated him less favorably than a non-disabled employee.  *See Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Scott testified that he was replaced by a non-disabled employee.[72]  Although Scott makes no effort to identify the person who allegedly replaced him or exactly when he or she was hired or promoted, his statement is not a mere conclusory allegation intended to rebut one of BP Amoco's grounds for summary judgement as the company suggests; rather, it embodies Scott's affirmative representation of fact to establish his prima facie case of discrimination.

However, the thrust of Scott's prima facie case is that he was treated less favorably than similarly situated, non-disabled employees.  Sanchez's declaration testimony that BP Amoco held Scott to a different standard than other Plant employees presents a fact issue as to whether Scott was treated less

---

[72] Dkt. No. 28, Ex.1.

favorably than non-disabled employees who were similarly situated.  Sanchez's testimony indicates that Scott was treated unfavorably and ultimately terminated because of biases against his speech impediment.   Reviewing Sanchez's declaration in the light most favorable to Scott reveals that other employees, ones who did not suffer impairments similar to Scott's or that BP Amoco regarded as similarly impaired as Scott, were held to a different, more favorable standard.  Thus, Scott has at least presented a fact issue as to whether BP Amoco replaced him with or treated him less favorably than a non-disabled employee.

### 3.   BP Amoco's Reasons for Terminating Scott as False and a Mere Pretext for Discrimination or Scott's Speech Impediment as a Motivating Factor in the Termination Decision

Because BP Amoco has clearly articulated and brought forth evidence supporting a legitimate, non-discriminatory reason for Scott's termination—the series of safety related incidents—the Court next addresses whether Scott has brought forth sufficient evidence to show that its reason was false and merely a pretext for BP Amoco's unlawful discrimination or that Scott's impairment was a motivating factor in the company's decision.[73]

Sanchez's declaration reveals that a fact issue exists as to whether Scott's final incident was one which a reprimand, much less a discharge, was necessary.  According to Sanchez, Scott did not violate any BP Amoco policy concerning his final incident.  Although BP Amoco contends that Scott's actions were a clear violation of company policy, construing this controversy in the light most favorable to the non-movant, as the Court must, the Court finds that a fact issue exists as to whether BP Amoco's reasons were false and a mere pretext for unlawful discrimination.  Even assuming BP Amoco's proffered

---

[73] As alluded to above, if Scott can establish for the purpose of summary judgment that BP Amoco's decision to terminate him was either (1) based on a falsely proffered non-discriminatory reason or (2) at least partially motivated by his speech impediment, Scott would establish both his prima facie case of discrimination and the third prong of the *McDonnell Douglas* test, precluding summary judgment as to his claims.

reasons for terminating Scott were true and Scott did violate some company policy, Sanchez's testimony and the circumstances surrounding Scott's termination would allow a reasonable jury to conclude that, on the basis of such evidence, Scott's speech impediment was a motivating factor in BP Amoco's decision to terminate his employment. Therefore, because a genuine issue of material fact exists as to whether BP Amoco's reasons for terminating Scott were false and a mere pretext for discrimination or Scott's speech impediment was a motivating factor in the company's decision to discharge him, the Court concludes that summary judgment is inappropriate.

### Conclusion

Based on the foregoing, the Court finds that Scott's harassment and delay in training claims are barred by the applicable statute of limitations and to the extent he wishes to asserts such claims, Defendant's Motion for Summary Judgment (Dkt. No. 24) is granted. The Court further finds that Scott has presented genuine issues of material fact as to whether BP Amoco (1) regarded Scott as disabled, (2) replaced him with or treated him less favorably than a non-disabled employee and (3) proffered a false, merely pretextual reason for its termination decision or based its decision at least partially on Scott's speech impediment. Thus, to the extent Scott asserts claims surrounding his termination from BP Amoco, Defendant's Motion for Summary Judgment (Dkt. No. 24) is denied.

It is so **ORDERED**

Signed this 25th day of March, 2008.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE